Filed 5/19/25  P. v. Shannon CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHANDALE DONTRAY SHANNON, JR., et al.,<br><br>Defendants and Appellants. | C096655<br><br>(Super. Ct. Nos. CR2018-3504-3, CR2018-3504-4)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the nonpublished opinion filed herein on May 12, 2025, be modified as follows:

On page 31, second sentence of the second paragraph on that page, the words "as applied to the facts here" are deleted and replaced with "under the *Chapman* standard" so the sentence now reads:

> Shannon does not address the prejudicial impact of the purported error under the *Chapman* standard.

1

There is no change in the judgment.

The petition for rehearing is denied.


BY THE COURT:


_____/s/_____
EARL, P. J.


_____/s/_____
ROBIE, J.


_____/s/_____
DUARTE, J.

Filed 5/12/25  P. v. Shannon CA3 (unmodified opinion)

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHANDALE DONTRAY SHANNON, JR., et al.,<br><br>Defendants and Appellants. | C096655<br><br>(Super. Ct. Nos. CR2018-3504-3, CR2018-3504-4) |

In a revenge killing, defendants Chandale Dontray Shannon, Jr., and Jesus Campos participated in the murders of two teenage boys whose bodies were never found. Campos, himself a teenager when the crimes occurred, was tried as an adult and like Shannon, was convicted of multiple murders, special circumstances, and other enhancements.  Campos contends that, pursuant to new legislation pertaining to juveniles, he is entitled to a new transfer hearing.  Campos further argues that the trial court erred in sentencing him to life without the possibility of parole (LWOP).  Both Campos and

1

Shannon contend the jury instructions permitted a conviction under an invalid theory of murder. They both further contend that because they were each sentenced to LWOP, the parole revocation fine must be stricken and errors on the abstract of judgment require correction.

We conclude that Campos is entitled to a new transfer hearing. Although we modify the judgment in his case to strike the parole revocation fine and order the correction of the abstract of judgment, we otherwise conditionally affirm the judgment and remand the cause for a new transfer hearing.

As to Shannon, we modify the judgment to strike the parole revocation fine and otherwise affirm, ordering correction of the abstract of judgment as described by this opinion.

## LEGAL AND FACTUAL BACKGROUND

Defendants Shannon, Campos, and brothers David Froste (David) and Jonathan Froste (Jonathan) were all charged with and convicted of murder for their individual roles in the kidnapping and murder of Elijah M. and/or the murder of Enrique R. Jonathan pled guilty to the second degree murder of Elijah and testified against the other three defendants. David was tried separately. The following was adduced at Shannon and Campos's joint trial.

Shannon, Campos, David, and Jonathan were friends who smoked and/or sold marijuana together. David was described as a very aggressive, intimidating person with a big personality who liked to be in charge. Shannon reportedly had a bad temper. Campos was known to bully and threaten people.

Elijah frequently bought marijuana from Shannon and Campos. In early October 2016, Elijah robbed David, Shannon, and Campos of marijuana and talked of doing it again. Although they all wanted revenge, David was particularly angry, "aggressive, irritated, upset" and wanted to "get" Elijah. When David, Shannon, and Campos were unable to find Elijah, they lured his friend Enrique to a remote location. When Enrique

2

would not agree to summon Elijah, David killed Enrique.  David, Shannon, Campos, and Jonathan later found, kidnapped, and murdered Elijah.  Afterwards, Campos told others about his involvement in the murders.

*Enrique's Disappearance and Murder*

Enrique was 16 years old when he disappeared in October 2016.  He and Elijah were friends.

The night of October 16 was the last time Enrique's parents saw him.  Although there was a series of text messages sent from Enrique's phone after that night, various factors suggested they were not from Enrique.

Jonathan testified to the following.  On October 17, David called Jonathan and said Elijah had just robbed him at gunpoint and he was going to shoot up Elijah's house.  David said Shannon and Campos were present when David was robbed.  David said he was going to get his gun, and he would meet Jonathan.  Later, David arrived at Jonathan's location with Shannon and Campos.  David said that "he want[ed] blood" and that they had driven around trying to find Elijah.  Shannon suggested they use Enrique to contact Elijah, and that became the plan.  Shannon, who was friends with Enrique, messaged Enrique and later picked him up.  Jonathan told David that he wanted no involvement and told David to calm down.

The next morning, David told Jonathan how he killed Enrique.  David, Shannon, and Campos picked up Enrique under the pretense they were going to a party.  Instead, they took him to the river.  David said he had to urinate, and when he got out of the car, he opened the trunk.  At David's request, Shannon joined him.  David retrieved his gun from the trunk and told Enrique to get out.  When Enrique refused, David fired his gun into the air.  David told Enrique to contact Elijah to meet him, and when Enrique did not comply, David told Enrique he was going to die.  David made Enrique remove his clothes.  Enrique did so, then ran into the river.  David shot at him, hitting him in his lower torso.  David dragged him out of the river and then shot him in the head, killing

3

him.  David borrowed a neighbor's truck, put Enrique's body in the truck, and went somewhere to bury him.  Campos was inside the car when Enrique was killed, but got out to throw up.

Shannon also gave Jonathan a similar account of what had happened to Enrique. While Shannon was with Jonathan, Shannon used Enrique's phone and texted Enrique's mother and friend to make it seem as if Enrique had run off.

Jonathan never talked to Campos about the incident.

*Elijah's Disappearance and Murder*

Elijah turned 17 on November 3 and disappeared the next day.  Subsequent text messages sent from Elijah's phone contained statements not typical of Elijah.

Jonathan testified to what happened to Elijah.  On November 4, after 1:00 p.m., Jonathan was with David and Campos when they saw Elijah on the street.  David confronted him, and Elijah apologized for the robbery.  David told him that as punishment, he should get in the trunk, and David would drive him far away and make him walk home.  David took Elijah's money, boots, and cell phone, which David turned off.  As directed by David, Jonathan opened the trunk, and Elijah got inside.

Jonathan drove to Shannon's apartment to retrieve David's gun.  David said he was going to kill Elijah.  Campos, who was in the car's backseat, made no response. Shannon gave the gun to David and when David told Shannon that Elijah was in the trunk, Shannon got into the car.  David repeated that he was going to kill Elijah.  David took everyone's phones and turned them off, so they could not be tracked.

David directed Jonathan to drive to a remote area.  There, Jonathan opened the trunk and Shannon pointed the gun at Elijah.  David zip-tied Elijah's hands together.  At David's direction, they all walked about a quarter of a mile and down the riverbank. David zip-tied Elijah's ankles together.

4

David gave the gun to Shannon and said to make sure Elijah stayed alive, so David could kill Elijah when he returned. Campos went with David to get supplies needed for disposing of Elijah's body.

Campos helped David carry garbage bags, a can of gasoline, bleach, shovels, and a pickax from the car. David told Elijah that he would be buried next to Enrique. David picked up a heavy tree branch and forcefully hit Elijah in the back of the head once or twice. Jonathan, Shannon, and Campos did the same. David then shot Elijah in the head to make sure he was dead.

All four of them dug a hole, and David put Elijah's body into it and lit the body on fire with gasoline. David put bleach on the body, and they filled in the hole. They all took precautions with their equipment and clothes so that blood was not transferred to the car. David told them not to say anything to anyone. The next day, David used Elijah's phone to text people.

*Statements by Campos and Shannon*

Campos told his younger brother that he and Shannon had been robbed, that they went to find the robber and a friend of the robber, and that the friend was shot. Campos said he and Shannon were present when the person was shot, but they did not participate. Campos told another friend that "he" and "they" shot Enrique after luring him out under false pretenses.

A few days after Elijah disappeared, Campos told a friend how he, Jonathan, Shannon, and David made Elijah suffer before they killed him.

Campos also told a different friend from school that he had killed someone; two people were killed, they buried the bodies, and that he, Shannon, and Jonathan were involved.

Detective Mathew Jameson interviewed Shannon multiple times; Shannon gave varying accounts. He eventually admitted that before Elijah robbed him, he was selling marijuana to Elijah almost daily. He also admitted they picked Enrique up and drove to a

body of water where David shot him. Shannon tried to show police where the bodies were located but did not find the location.

After Campos was arrested, he said that he wanted a deal to get out of jail before he would talk to law enforcement. That same day, a confidential informant, who pretended to have been arrested, was placed in jail with Campos. The informant recorded his conversations with Campos, which were consistent with previous accounts.

The prosecutor filed a wardship petition against Campos, who was 17 years old at the time of the crimes, under Welfare and Institutions Code section 602.[1] He also filed a motion to transfer Campos to criminal court under section 707. Following a contested hearing in 2019, the juvenile court ordered that Campos be transferred to criminal court.

For his part, Jonathan entered into a plea agreement to testify against David, Shannon, and Campos in exchange for a conviction of second degree murder. David was tried separately and was convicted of the second degree murder of Enrique, the first degree murder of Elijah with the special circumstance of murder during kidnapping, of kidnapping Elijah, and the special circumstance of multiple murders. Another panel of this court affirmed David's convictions. (*People v. Froste* (C088686, Feb. 28, 2022) [nonpub. opn.].) Shannon and Campos were tried together.

The jury found Shannon guilty of the willful, deliberate, and premeditated first degree murders of Enrique and Elijah (Pen. Code, §§ 187, subd. (a), 189) (counts 1 & 2) with a kidnap-murder special circumstance associated with count 2 (Pen. Code, § 190.2, subd. (a)(17)) and that a principal was armed with a firearm during the commission of the murders (Pen. Code, § 12022, subd. (a)(1)). The jury also found him guilty of kidnapping Elijah (Pen. Code, § 207, subd. (a)) (count 3). The jury found true a multiple-murder special circumstance. (Pen. Code, § 190.2, subd. (a)(3).)

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

6

As to Campos, the jury found true the same allegations and found him guilty of the same offenses except for count 1, where it found him guilty of second degree murder of Enrique. The trial court found true the sentencing aggravating-factor allegations as to Shannon and Campos, including that the crime involved great violence and the victim was vulnerable. (Pen. Code, § 1170, subd. (b); Cal. Rules of Court, rule 4.421.)

The trial court sentenced Shannon on counts 1 and 2 to state prison for LWOP plus two additional years, one year for each of the firearm enhancements. The trial court sentenced Campos to state prison for 15 years to life on count 1, and LWOP on count 2, plus two additional years, one year for each of the firearm enhancements. For both Shannon and Campos, the trial court imposed upper terms of eight years on count 3 and stayed the terms pursuant to Penal Code section 654.

## DISCUSSION

### I

### *Juvenile Transfer Hearing*

Campos contends that he is entitled to a new juvenile transfer hearing in light of recent ameliorative changes in the law. The People argue he may not challenge his transfer hearing on appeal from his conviction. We agree with Campos. In explaining why Campos is entitled to seek this relief on appeal from his conviction, we begin with recent and relevant changes to the law regarding juvenile offenders.

#### A. Section 707

Section 707 governs the procedure for transferring a minor from juvenile court to adult criminal court. At the time of Campos's transfer hearing, section 707 required the prosecution to prove by a preponderance of the evidence that he should be transferred to adult criminal court. (Former § 707, subd. (a)(3).) In making that decision, the juvenile court was required to consider five criteria: (1) the degree of criminal sophistication exhibited by the minor; (2) whether the minor can be rehabilitated prior to the expiration of the juvenile court's jurisdiction; (3) the minor's previous delinquent history; (4) the

7

success of previous attempts to rehabilitate the minor; and (5) the circumstances and gravity of the offense committed by the minor. (Former § 707, subd. (a)(3)(A)-(E).)

Here, the juvenile court considered each of the criteria specified in former section 707, subdivision (a) and "exercised discretion in determining the respective weight to be given to each" factor. In doing so, it gave the greatest weight to the criteria relating to Campos's ability to be rehabilitated in the juvenile system and the circumstances and gravity of the offense. The court also found significant but of lesser weight the criteria relating to criminal sophistication and prior attempts to rehabilitate Campos. The court gave the least weight to Campos's previous delinquent history. Considering all five criteria together, the court concluded that the prosecution proved by a preponderance of the evidence that Campos should be transferred to adult criminal court and granted the motion.

1. Assembly Bill No. 2361 (2021-2022 Reg. Sess.)

Effective January 1, 2023, while this appeal was pending, the Legislature amended section 707 to add, inter alia, the following language: "In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (§ 707, subd. (a)(3); Stats. 2022, ch. 330, § 1). "This amendment changed the procedure for ordering a juvenile transfer in three material ways, by (1) raising the prosecution's burden of proof, (2) requiring a new specific finding regarding amenability to rehabilitation, and (3) requiring the court to state the reasons supporting a finding that the minor is not amenable to rehabilitation." (*In re J.M.* (2024) 103 Cal.App.5th 745, 752; see also *In re E.P.* (2023) 89 Cal.App.5th 409, 416.)

2. Senate Bill No. 545 (2023-2024 Reg. Sess.)

In addition to these changes, Senate Bill No. 545 (2023-2024 Reg. Sess.) (Senate Bill 545) amended section 707 effective January 1, 2024. Prior to the passage of Senate Bill 545, to transfer an individual to criminal court, the juvenile court was assigned the

8

*discretion* to give weight to any relevant factor. (Legis. Counsel's Dig., Sen. Bill 545 (2023-2024 Reg. Sess.).) With these recent amendments, the juvenile court is now *required* to give weight to any factor relevant to the specifically identified criteria for making the amenability determination. (§ 707, subd. (a)(3)(A)(ii), (B)(ii), (C)(ii), (D)(ii) & (E)(ii).) The new law also specifies additional factors the juvenile court must consider when evaluating the minor's criminal sophistication, including the existence of childhood trauma; the minor's involvement in the child welfare or foster care system; and the status of the minor as a victim of human trafficking, sexual abuse, or sexual battery. (§ 707, subd. (a)(3)(A)(ii).) Finally, the law now requires the court to give weight to evidence that indicates the person against whom the minor is accused of committing an offense trafficked, sexually abused, or sexually battered the minor. (§ 707, subd. (a)(3)(E)(iii).)

3. Effect of Amendments to Section 707

" 'It is well settled that a new statute is presumed to operate prospectively' " (*People v. Stamps* (2020) 9 Cal.5th 685, 698), but pursuant to *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), "new laws that mitigate punishment . . . are presumed to apply to cases charged before the law's enactment but not yet final." (*People v. Padilla* (2022) 13 Cal.5th 152, 160 (*Padilla*).) We review questions of retroactivity de novo. (*In re A.M.* (2024) 102 Cal.App.5th 557, 565.)

The recent amendments have similar ameliorative effects to amendments made to section 707 by Proposition 57, which prohibited prosecutors from charging juveniles with crimes directly in a court of criminal jurisdiction and assigned the prosecution the burden of proof at transfer hearings. (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1288; see *id.* at p. 1289 [holding the amendments to § 707 are retroactive under *Estrada*].) In *People v. Superior Court* (*Lara*), our Supreme Court held that Proposition 57 amendments apply retroactively because they effectively reduce the possible punishment for juveniles: "The possibility of being treated as a juvenile in juvenile court—where rehabilitation is the goal—rather than being tried and sentenced as an adult can result in dramatically

9

different and more lenient treatment." (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303; see *Estrada*, *supra*, 63 Cal.2d 740.)  So too here.  The recent amendments to section 707 brought on by Assembly Bill No. 2361 (2021-2022 Reg, Sess.) (Assembly Bill 2361) and Senate Bill 545 have ameliorative effects in that they make it more difficult to transfer minors from juvenile court, which can result in more lenient treatment.  Absent evidence to the contrary, we must assume that an amended statute that mitigates the possible punishment for a class of persons is presumptively retroactive and applies to all persons whose judgments were not final at the time the statute took effect. (*Lara*, at p. 308; *People v. McKenzie* (2020) 9 Cal.5th 40, 45 (*McKenzie*) [presumption of retroactivity " ' "applies to any such proceeding which, at the time of the supervening legislation, has not yet reached final disposition in the highest court authorized to review it" ' "]; *In re Miguel R.* (2024) 100 Cal.App.5th 152, 169-170 [discussing the retroactive application of Assem. Bill 2361 and Sen. Bill 545].)[2]  Accordingly, we conclude the *Estrada* rule applies to the amendments to section 707.

*B. Section 801*

The People barely address retroactivity of the above legislation.  Rather, they essentially argue that the recent enactment of section 801 trumps Campos's entitlement to the ameliorative benefits of changes to section 707.  We disagree.  The People rely on the fact that when Campos was transferred to criminal court, the only way to challenge a

---

[2]     We also note that effective September 13, 2023, Senate Bill No. 135 (2023-2024 Reg. Sess.) (Senate Bill 135) expanded the juvenile court's jurisdiction to include individuals aged 25 years and above:  "The court may retain jurisdiction over a person who is 25 years of age or older for a period not to exceed two years from the date of disposition if the person is found to be a person described in Section 602 by reason of the commission of an offense listed in subdivision (b) of Section 707.  The court shall exercise jurisdiction in conformance with the objectives of the juvenile court."  (§ 607, subd. (d).)  This amendment was made expressly retroactive under section 607, subdivision (m).

transfer order was through an extraordinary writ petition, which he did not do. (See *People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 709, disapproved on another ground in *People v. Green* (1980) 27 Cal.3d 1, 33; Cal. Rules of Court, former rule 5.770.)[3] As the People also note, effective January 1, 2022—more than two years after Campos's transfer hearing, but while Campos was still awaiting trial—the Legislature enacted section 801, which made transfer orders subject to direct appeal within 30 days of the order and prohibited consideration of such orders on appeal from a conviction. (§ 801, subd. (a), added by Stats. 2021, ch. 195, § 1 ["[a]n order transferring the minor from the juvenile court to a court of criminal jurisdiction may not be heard on appeal from the judgment of conviction"].) The People thus contend that because the provisions of section 801 are not ameliorative and apply prospectively only, Campos is precluded from making *any* challenge to his transfer hearing on direct appeal from his conviction, including the claim that he is entitled to the benefits of the changes to section 707. For the following reasons, we conclude that as Campos's case is not final, section 801 does not preclude him from receiving the benefit of ameliorative changes to the law.[4]

" 'Appellate courts have jurisdiction over a direct appeal . . . only where there is an appealable order or judgment. (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696 (*Griset*); *Jennings v. Marralle* (1994) 8 Cal.4th 121, 126 (*Jennings*) [an appealable order or judgment "is a jurisdictional prerequisite to an appeal"].) "A trial court's order is appealable when it is made so by statute." (*Griset*[, *supra*, 25 Cal.4th] at p. 696.)' " (*People v. Montellano* (2019) 39 Cal.App.5th 148, 153.)

---

[3] California Rules of Court, rule 5.770, as amended May 22, 2017.

[4] In light of our conclusion, we need not consider Campos's alternative request that, if we find he has no right to appeal his transfer order, we treat the argument as a petition for writ of habeas corpus based on ineffective assistance of counsel for failing to file the petition for writ of mandate.

We agree that because the amendments to section 801 do not lessen criminal punishment or reduce criminal liability, section 801 is not retroactive. (See *People v. Pineda* (2022) 78 Cal.App.5th 491, 498 [holding that the ability to directly appeal a transfer order under § 801 does not apply retroactively].) We also agree that to the extent Campos seeks to challenge the factual findings of the juvenile court under the law at that time, he was required to do so through writ review and such a challenge is foreclosed on direct appeal from his conviction pursuant to both the longstanding aforementioned rule and newly enacted section 801. (See *People v. Superior Court* (*Steven S.*) (1981) 119 Cal.App.3d 162, 167.) But the issue here is not one of trial error. Rather, Campos's claim is based on the amendments to section 707, an event that occurred long after his transfer hearing and the time for seeking writ review. Indeed, Campos could not have raised this issue in a petition for extraordinary relief. (Cf. *McKenzie*, *supra*, 9 Cal.5th at p. 50 [within the context of changes to criminalizing drug statutes, the court rejected the People's argument that the defendant's failure to appeal his probation order foreclosed the argument on appeal that he was entitled to the benefits of subsequent ameliorative legislation, noting that the defendant could not have raised the issue on direct appeal].) Thus, we do not see section 801 as an absolute bar to obtaining relief through the ameliorative laws, when the case is otherwise one "to which it constitutionally could apply." (*Estrada*, *supra*, 63 Cal.2d at p. 745.) While section 801 may indicate an " 'expectation regarding how the statute normally will apply going forward' " that " 'is quite different from the specific retroactivity question presented here, to which the *Estrada* inference applies.' " (*People v. Braden* (2023) 14 Cal.5th 791, 802; cf. also *id*. at pp. 824-825 [concluding that going forward, application of the pretrial mental health diversion statute requires a defendant to seek such diversion before jeopardy attaches or before entry of a plea, but that a defendant whose case is pending on appeal and did not have the opportunity to request the diversion should also be allowed to do so retroactively under *Estrada*].)

California Supreme Court precedent holds that "new laws that reduce the punishment for a crime are presumptively to be applied to defendants whose judgments are not yet final." (*People v. Conley* (2016) 63 Cal.4th 646, 656, citing *Estrada*, *supra*, 63 Cal.2d 740.) When that presumption applies, its retroactivity rule extends to *all* "nonfinal judgments." (*People v. Esquivel* (2021) 11 Cal.5th 671, 677; see *Padilla*, *supra*, 13 Cal.5th at p. 158 [concluding the defendant was entitled to the benefits of Prop. 57 through application of the *Estrada* rule during resentencing when a criminal court sentence imposed on a juvenile offender before the initiative's passage has since been vacated, because his case was no longer final].) In *Padilla*, the court reiterated that when the Legislature "amends a statute so as to lessen the punishment," it "must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*Estrada*, *supra*, 63 Cal.2d at p. 745.) "Because the Legislature has 'determined that its former penalty was too severe,' the only reason to apply that penalty in pending cases would be 'a desire for vengeance,' a motivation we decline to attribute to our lawmakers." (*Padilla*, at p. 160.) The court recognized that "any restrictions on [the Legislature's] power [to intervene in judicial decisionmaking] would attach at 'the conclusion of a criminal proceeding as a whole'—i.e., when ' "the last word of the judicial department with regard to a particular case or controversy" ' has issued." (*Id.* at p. 161.) But it also explained that there are no similar constitutional concerns that arise when the Legislature or electorate enacts new laws altering *nonfinal* judgments. (*Ibid.*, citing *People v. Esquivel*, *supra*, 11 Cal.5th at pp. 678-679.)

It cannot reasonably be disputed that Campos's case is not yet final. The real question is whether the prohibition against direct appeal in section 801 can deprive Campos of the benefits of the retroactive changes in section 707. We conclude it cannot.

The logical extension of the People's argument is that because the transfer order was "final" for appellate purposes, it is also final for *Estrada* purposes. The California

13

Supreme Court has rejected this type of argument. For example, in *McKenzie*, the court rejected the argument that because an original probation order was a final judgment for purposes of filing an appeal, it was therefore final for *Estrada* purposes. (*McKenzie*, supra, 9 Cal.5th at p. 46.)[5] The *Padilla* court also rejected the invitation to distinguish types of nonfinal cases for *Estrada* purposes (in that case, "cases that are nonfinal because the defendant is undergoing retrial or resentencing and those . . . 'not yet final on initial review' ") because *Estrada* made no such distinction. (*Padilla*, supra, 13 Cal.5th at p. 162.) Instead, "[t]he relevant cutoff point under *Estrada* for applying ameliorative amendments is the date the 'judgment of conviction becomes final.' " (*McKenzie*, at p. 46.)

As the *Padilla* court explained, the Legislature has the prerogative to write statutes that specify retroactive application, including the prerogative to disclaim the application of a new ameliorative law in certain situations. "But we have not presumed from statutory silence any retroactive intent less than that described in *Estrada*—i.e., absent a discernable intent to the contrary, ameliorative criminal laws apply to all nonfinal cases." (*Padilla*, supra, 13 Cal.5th at p. 162.) Because section 707 does not contain any indication that the Legislature intended to limit retroactive application of the amendments' benefit, we presume they are available to a defendant on appeal where his or her case is not final. Given that the new legislation requires, among other findings, a more difficult burden of proof to be met prior to transferring a minor to criminal court, the Legislature has signaled an intent to expand juvenile court jurisdiction over minor offenders, giving every indication that the Legislature meant for the new, rather than the

---

**5**     Compare *People v. Superior Court* (*Rodas*) (2017) 10 Cal.App.5th 1316, 1325 where the court concluded that because the order granting probation constitutes a final judgment of conviction under Penal Code section 1237, the defendant's failure to appeal the order rendered the case final for retroactivity purposes.

old, statute to apply to as many minors as legally possible.  (Cf. *People v. Frahs* (2020) 9 Cal.5th 618, 632 [concluding that the breadth of the mental health diversion statute's statement of purpose is consistent with the retroactive application of the diversion scheme].)  If we were to apply section 801 in the manner proposed by the People, we would thwart the legislative intent behind the amendments to section 707 and greatly limit the impact of these ameliorative effects.  We decline to do so.  (Cf. *McKenzie*, *supra*, 9 Cal.5th at pp. 50-51 [finding no basis to find an intention to apply the old statute imposing punishment to those on probation "simply because they may no longer appeal from orders granting probation as to which there was no ground for appeal" when the new statute completely eliminated punishment].)

In accord with *Estrada*, our presumption is that the Legislature intended that reduction in punishment to stretch " 'as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' "  (*People v. Superior Court* (*Lara*), *supra*, 4 Cal.5th at p. 308.)  Indeed, the statutory changes made to sections 707 and 607 indicate a clear intent to make it more difficult to transfer a minor to criminal court as well as an intent to retain jurisdiction over a minor for a longer period. The Legislative goals are furthered by the court's ability to provide retroactive relief and, notwithstanding section 801, nothing about the *Estrada* presumption is undermined when a minor attempts to obtain the benefits of ameliorative changes to the law on appeal from a conviction.

### C. Remedy

The juvenile court's original transfer decision in 2019 was necessarily made without the benefit of any of the subsequent ameliorative changes in the law under Assembly Bill 2361, Senate Bill 545, or Senate Bill 135.  " ' "[Minors] are entitled to [transfer] decisions made in the exercise of the 'informed discretion' of the [juvenile] court.  [Citations.]  A court [that] is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose [transfer decision] is or may

15

have been based on misinformation regarding a material aspect of a [minor]'s record."
[Citation.] In such circumstances . . . the appropriate remedy is to remand for [a new
fitness hearing] unless the record "clearly indicate[s]" that the [juvenile] court would
have reached the same conclusion "even if it had been aware that it had such
discretion." ' " (*People v. Salazar* (2023) 15 Cal.5th 416, 424; see also *In re J.M.*, *supra*,
103 Cal.App.5th at p. 753 [applying *Salazar* standard].)

Because the record does not clearly indicate that the trial court would have
reached the same conclusion even if it had been aware of the full scope of its powers,
especially in light of the multitude of subsequent legislative changes, we will
conditionally affirm the judgment and remand with directions to conduct a new transfer
hearing under the new standards. (*People v. Salazar*, *supra*, 15 Cal.5th at pp. 419, 425;
*In re F.M.* (2023) 14 Cal.5th 701, 714-716.) We express no opinion on how the juvenile
court should rule on the merits.

II

*Campos's Second Degree Murder Conviction as an Aider and Abettor*

The jury convicted Campos of the second degree murder of Enrique and the jury
was instructed that to find Campos guilty of either first or second degree murder, it must
find that he acted with express or implied malice aforethought. (CALCRIM No. 520.)
Campos contends "the only conceivably tenable theory for convicting [him] of second
degree murder" was implied malice and that the jury instructions on aiding and abetting
implied malice second degree murder were fatally flawed because they failed to convey
the required elements of aiding and abetting an implied malice murder. (CALCRIM
No. 401.)

Despite his failure to object to the instructions at trial, Campos contends the issue
is cognizable on appeal because his substantial rights were impacted. (Pen. Code,
§ 1259.) "Because [Campos's] contention is that the instructions caused him to be
convicted under an invalid legal theory, this contention need not be preserved by

16

objection in order to be considered on appeal." (*People v. Powell* (2021) 63 Cal.App.5th 689, 710 (*Powell*); see *People v. Valdez* (2012) 55 Cal.4th 82, 151.) In reviewing a claim of instructional error, we review the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

"[U]nder direct aiding and abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 843, superseded by statute on other grounds as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.) Although recent amendments by the Legislature have narrowed or eliminated certain forms of accomplice liability for murder (*People v. Curiel* (2023) 15 Cal.5th 433, 440), aiding and abetting implied malice murder remains a valid theory of liability (*People v. Schell* (2022) 84 Cal.App.5th 437, 442). Nevertheless, Campos contends that the instructions used in this case, CALCRIM Nos. 401 and 520, do not properly convey recent changes to the law because they do not require that he intended to aid the perpetrator's fatal act of shooting Enrique and that he, by words or conduct, actually aided and abetted it.

Campos suggests this change in law was made by the California Supreme Court in *People v. Reyes* (2023) 14 Cal.5th 981, 990-992 (*Reyes*), when it endorsed the definition stated in *Powell, supra*, 63 Cal.App.5th at pages 712-714. In addition, Campos suggests the change in law is demonstrated by the addition of CALCRIM No. 526, which clarifies the requirements to prove aiding and abetting implied malice murder and is reflected by a bench note to CALCRIM No. 401's September 2023 revision, which directs the instruction is not to be given when instructing on aiding and abetting implied malice murder.

17

We disagree. As we read *Reyes* and *Powell*, those cases clarified the definition of aiding and abetting implied malice murder but did not change it. CALCRIM Nos. 520 and 401 needed clarification too, but they contained the requirements that continue to be valid.

In *Powell*, *supra*, 63 Cal.App.5th 689, the court concluded that while CALCRIM No. 401 requires an intent to aid and abet a "crime," it does not instruct the jury that the aider and abettor must personally harbor the mental state of implied malice to be convicted of second degree murder. (*Powell*, at p. 714.) Therefore, the instructions were erroneous and deemed "not tailored for" the crime of second degree implied malice murder. (*Ibid*.)

In *Reyes*, *supra*, 14 Cal.5th 981, our Supreme Court discussed the elements of aiding and abetting implied malice murder that were established in *Powell*, *supra*, 63 Cal.App.5th 689. " '[T]he actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.' " (*Reyes*, at p. 991, quoting *Powell*, at p. 713.) "The relevant act is the act that proximately causes death." (*Powell*, at p. 713, fn. 27.) "[A]cts that merely create a dangerous situation in which death is possible depending on how circumstances unfold do not, without more, satisfy this causation requirement." (*Reyes*, at p. 989.)

Accordingly, in *Reyes*, our high court held that the mere fact that the defendant "proceeded to an area on the edge of territory belonging to a rival gang . . . alongside the other bikers [one of whom was armed], chased after [the victim]'s car," was insufficient to support that he aided and abetted another biker's shooting of the victim. (*Reyes*, *supra*,

18

14 Cal.5th at p. 989.) Because "the life-endangering act [proximately causing death] was the shooting," the relevant questions to ask were "whether [the defendant] knew that [the shooter] intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Id*. at p. 992.)

After the decision in *Reyes* was issued, the Judicial Council of California added CALCRIM No. 526 (Implied Malice Murder: Aiding and Abetting). (CALCRIM No. 526 (Sept. 2023 Supp.) p. 41.) The instruction requires proof that the perpetrator committed an act that was dangerous to human life and caused the death of another; that the defendant knew that the perpetrator intended to commit the act; that the defendant intended to aid and abet the perpetrator in committing the act, knowing the act was dangerous to human life; and that by words or conduct, the defendant did aid and abet the perpetrator's commission of the acts. (CALCRIM No. 526.)

*Powell* and *Reyes* are factually distinguishable in that they each addressed cases involving the natural and probable consequences doctrine—an invalid theory of liability. (See *Reyes*, *supra*, 14 Cal.5th at pp. 985, 987; *Powell*, *supra*, 63 Cal.App.5th at p. 708.) Moreover, that CALCRIM No. 526 was added after *Reyes* is of no consequence here because " 'jury instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent. They should not be cited as authority for legal principles.' " (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1157, fn. 7.)

Finally, the instructions given under the circumstances in this case provided the correct elements of aiding and abetting implied malice second degree murder. The court instructed the jury that to find Campos liable under a theory of aiding and abetting, the People had to prove the perpetrator committed "the crime" and defendant knew the perpetrator's intent to do so, intended to aid the perpetrator in committing "the crime," and that defendant's words or conduct did aid and abet the perpetrator's commission of "the crime." (CALCRIM No. 401.) Here, "the crime" could only be murder as neither Campos nor Shannon were charged with committing any other crime against Enrique.

19

Because the only evidence regarding how Enrique was murdered was that he was shot, the shooting was the act at issue. CALCRIM No. 520 instructed the jury as to implied malice second degree murder and required it to find that a perpetrator intentionally committed an act that caused the death of another (i.e., the shooting) the natural and probable consequence of which were dangerous to human life; at the time he acted, he knew it was dangerous; and that he deliberately acted with conscious disregard for human life. (CALCRIM No. 520.)

Combining CALCRIM Nos. 401 and 520 to find Campos guilty of implied malice second degree murder under the facts of this case, the jury was essentially charged with finding that the perpetrator intentionally killed Enrique (by knowingly committing an act dangerous to human life that caused Enrique's death—the shooting—and deliberately acting with conscious disregard for that danger), that Campos knew of and shared the perpetrator's intent to shoot Enrique, and did aid and abet in the shooting. Although the instructions do not explicitly state that Campos must know the perpetrator's act (of shooting Enrique) was dangerous to human life, under the facts of this case, there was no way to find Campos guilty of second degree murder without implicitly finding Campos had knowledge of the act's dangerousness. (Cf. *In re Lopez* (2023) 14 Cal.5th 562, 580 [when a jury is instructed on both a valid and invalid theory of liability, a reviewing court may assess prejudice by " 'examin[ing] what the jury necessarily did find and ask[ing] whether it would be impossible, on the evidence, for the jury to find *that* without *also* finding the missing fact as well' " (italics omitted)].) Here, if the jury convicted Campos of murder on a theory of direct aiding and abetting, the jury necessarily concluded that Campos knew of David's intention to shoot Enrique, that such an act was dangerous to human life, and that Campos intended to aid and abet David in committing the crime of murder. This is consistent with *Reyes*.

20

III

*Campos's LWOP Sentence*

Campos argues the trial court abused its discretion in imposing a term of LWOP based on the record before it. He argues his culpability for the crimes was greatly reduced by his immaturity and youth, "deprived background," and the dominating force of David—all factors beyond his control. He further argues that substantial evidence does not support a finding that he could not be rehabilitated.

"[T]he Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." (*Miller v. Alabama* (2012) 567 U.S. 460, 479.) However, a state may authorize its courts to impose LWOP on a juvenile homicide offender, as long as the sentence is discretionary. (*Id*. at pp. 477-480.) To properly exercise its discretion, a sentencing court must consider an offender's youth and attendant characteristics before imposing LWOP, to help ensure the sentence is appropriate in light of the offender's age. (*Jones v. Mississippi* (2021) 593 U.S. 98, 111-112.) In *Miller,* the high court discussed a range of factors relevant to a sentencing court's determination that a defendant is a " 'rare juvenile offender whose crime reflects irreparable corruption' " warranting an LWOP sentence. (*Miller*, at pp. 479-480.)

In California, Penal Code section 190.5 permits a trial court to sentence 16 and 17 year olds convicted of special circumstance murder to either LWOP or 25 years to life. (Pen. Code, § 190.5, subd. (b).) The California Supreme Court has held that, when properly construed, Penal Code section 190.5 does not presume that LWOP should be imposed, and therefore does not violate the Eighth Amendment. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1360-1361 (*Gutierrez*).) Instead, the sentencing scheme "authorizes and indeed requires consideration of the distinctive attributes of youth highlighted in *Miller*." (*Id*. at p. 1361.)

Thus, in sentencing a minor to LWOP, trial courts must consider the following factors: (1) "a juvenile offender's 'chronological age and its hallmark features—among

them, immaturity, impetuosity, and failure to appreciate risks and consequences' ";
(2) " 'the family and home environment that surrounds [the juvenile]—and from which
he cannot usually extricate himself—no matter how brutal or dysfunctional' "; (3) " 'the
circumstances of the homicide offense, including the extent of [the juvenile defendant's]
participation in the conduct and the way familial and peer pressures may have affected
him' "; (4) "whether the offender 'might have been charged and convicted of a lesser
offense if not for incompetencies associated with youth—for example, his inability to
deal with police officers or prosecutors (including on a plea agreement) or his incapacity
to assist his own attorneys' "; and (5) " 'the possibility of rehabilitation.' " (*Gutierrez*,
*supra*, 58 Cal.4th at pp. 1388, 1389.) However, the sentencing court is not required to
make any specific finding regarding a juvenile's incorrigibility, nor is it required to
provide an on-the-record explanation. (*Jones v. Mississippi*, *supra*, 593 U.S. at pp. 112-
114.)

We review factual findings for substantial evidence. (E.g., *People v. Jones* (2002)
103 Cal.App.4th 1139, 1143.) And we review the trial court's sentencing decision for
abuse of discretion. (*Gutierrez*, *supra*, 58 Cal.4th at p. 1379.) The party challenging the
sentence bears the burden of " ' "clearly show[ing] that the sentencing decision was
irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is
presumed to have acted to achieve legitimate sentencing objectives, and its discretionary
determination to impose a particular sentence will not be set aside on review." ' "
(*People v. Carmony* (2004) 33 Cal.4th 367, 376-377.)

Because consideration of youth-related mitigating factors at sentencing pursuant to
Penal Code section 190.5, subdivision (b) remains a statutory requirement, compliance
with it is subject to challenge on appeal. (See *People v. Ochoa* (2020) 53 Cal.App.5th
841, 850-852, *People v. Guerrero* (2022) 76 Cal.App.5th 329, 337.) To conclude
otherwise would render any sentencing claim unreviewable for an abuse of discretion.

22

Here, the prosecution submitted a sentencing statement that addressed all the *Miller* factors and requested the trial court "rely on all documents obtained in the juvenile court files the Court has taken judicial notice of" as well as the transfer report authored by the probation department. Campos's defense counsel also filed a sentencing statement, which the court stated it read.

The trial court explained its reasoning for imposing a sentence of LWOP as follows: "After almost 20 years on the bench, this particular case presented facts—there's only two cases in my time on the bench that are so onerous that words almost fail me to talk about it. And believe me, words rarely fail me. But this case and one other that I can think of are the worst. The crimes were evil, the families have been impacted terribly, and two boys are dead. [¶] So, essentially, I find that both Mr. Campos and Mr. Shannon have forfeited their right to live in civilized society. I find that both Mr. Campos and Mr. Shannon are dangerous to the public. And Mr. Campos, as a juvenile, I find is incorrigible. [¶] So the Court is going to sentence. We'll start with Mr. Campos. . . . [¶] . . . [¶] As to Count 2, the 187(a) of the Penal Code, again, murder, a felony, the victim being [Elijah], life in prison without the possibility of parole is the sentence, and that is consecutive to any other terms imposed." The court noted the murder was willful, deliberate, and premeditated and occurred "during the commission or attempted commission of kidnapping pursuant to Penal Code Section 190.5(b). This triggers a life term in prison without the possibility of parole, or, at the discretion of the Court, 25 years to life as to Count 2. The Court has that choice." The court also sentenced Campos to a consecutive term of 15 years to life for the second degree murder of Enrique.

Campos contends substantial evidence does not support the court's ultimate conclusion that he is incorrigible, warranting an LWOP sentence. He argues that he "fits the portrait of a juvenile offender who due to his age was impacted by immaturity, a poor home environment, and negative peer and gang influences." He claims he was "ripe for control and manipulation by [David]" and that if he had been treated in a locked

23

Department of Juvenile Justice facility, he would have been rehabilitated. The record does not support all of these assertions. Although David was an aggressive person, there was no evidence that he specifically coerced or manipulated Campos into participating in these murders or any other event. And Campos provides no basis for the speculation that he could have been rehabilitated if placed in a locked facility, other than the fact that "children have greater prospects for reform" and the Department of Juvenile Justice has "strong programs."

Even "viewed through the lens of factors relating to his age and maturity," many of the facts relied upon by Campos also provide substantial evidence for the trial court's finding of incorrigibility. For instance, the record shows he was involved in substance abuse from age 12 or 13 and has been involved in the criminal justice system since age 13. He spent "a significant amount of time in the Juvenile Detention Facility" and two years in a group home where he struggled with his mental health. When he returned home, he was offered wraparound services for a year but "struggled to engage." Rather than take his prescribed medication, he self-medicated with marijuana and alcohol. According to the probation department, he was offered every opportunity to succeed through community services, out of home placement and re-entry services—the most intensive services the county could offer short of confinement in the Department of Juvenile Justice. Given Campos's age at the time of trial, probation opined that juvenile jurisdiction would not extend far enough to provide a chance at rehabilitation, especially given Campos's approach to change in the past. Indeed, Campos candidly admits he "was not often cooperative with the probation department's efforts to improve his behavior."

To be sure, Campos has experienced challenges growing up with unfortunate factors at play in his upbringing. But we cannot ignore the many opportunities he has had to correct his path. And, in addition to Campos's prior experience as a juvenile offender, his participation in the two murders in this case—weeks apart with the second

24

more violent than the first—also shows an increasing willingness to participate in violent crimes.

Campos also contends that the court's statements demonstrate the court did not engage in the proper analysis because they emphasize the "the evilness of the murders of 'two boys' " without properly considering that Campos, too, was a boy. We disagree. The trial court acknowledged it had discretion to sentence Campos to LWOP or to 25 years to life; it understood that there was no presumption that an LWOP sentence was appropriate under Penal Code section 190.5. Further, the court stated it read and considered all materials submitted by the parties, which included a discussion of the *Miller* factors and mitigating circumstances. Thus, the record demonstrates the court considered the appropriate factors in sentencing Campos to LWOP. (Cf. *People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527 ["[I]n light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, [the reviewing court] cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of [its] discretion"]; see Cal. Rules of Court, rule 4.409 ["[r]elevant factors enumerated in these rules must be considered by the sentencing judge, and will be deemed to have been considered unless the record affirmatively reflects otherwise"].)

Nevertheless, Campos argues the trial court abused its discretion by assigning too much weight to the circumstances of the crime, and not enough to his immaturity, deprived background, or David's intimidation. But the court had no obligation to provide an on-the-record explanation of its deliberative process in considering the relevant factors. (*Jones v. Mississippi*, *supra*, 593 U.S. at pp. 112-114.) The fact that the court chose to make statements regarding the terrible nature of the second murder does not change that fact.

We are mindful that " '[n]o particular factor, relevant to the decision whether to impose LWOP on a juvenile who has committed murder, predominates under the law.

25

Hence, as long as a trial court gives due consideration to an offender's youth and attendant characteristics, as required by *Miller* [, *supra*, 1567 U.S. 460], it may, in exercising its discretion under . . . section [190.5(b)], give such weight to the relevant factors as it reasonably determines is appropriate under all the circumstances of the case.' " (*People v. Blackwell* (2016) 3 Cal.App.5th 166, 200.)  The trial court's election to weigh and analyze the facts as it did is the "very essence of the exercise of 'discretion' "—the power to make "comparisons, choices, judgments, and evaluations." (*Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 749 [explaining why the exercise of discretion involved in the county's selection of a custodian for a potentially dangerous minor is immunized under Gov. Code, § 820.2].)  It bears underscoring that the abuse of discretion standard is deferential, and we review the trial court's decision to determine whether it was " 'arbitrary or capricious' or otherwise exceed[ed] the bounds of reason under the circumstances." (*People v. Olguin* (2008) 45 Cal.4th 375, 384; accord, *People v. Westerfield* (2019) 6 Cal.5th 632, 682.)  Neither Campos's nor anyone else's potential disagreement with the trial court's decision in this case suffices to demonstrate an abuse of discretion.  (*People v. Carmony*, *supra*, 33 Cal.4th at p. 377.)

IV

*Shannon's Conviction as an Accomplice*

Shannon contends the prosecutor's pursuit of a conviction for murder based on an uncharged conspiracy theory was improper because under the statutory definition of principal under Penal Code section 31, participation in a conspiracy alone is not an authorized basis for finding a person guilty of a substantive offense.  He further contends the uncharged conspiracy instructions allowed the jury to interpret his participation in a conspiracy as a type of aiding and abetting, without requiring the jury to actually assess whether his conduct aided the murder in the manner required under current law.  He acknowledges there is precedent suggesting the contrary but urges us to reexamine the

argument in light of recent changes to accomplice liability for murder. The People argue that Shannon forfeited the argument, and that the argument has no merit.

Although Shannon did not object to the instructions at trial, he contends the issue is cognizable on appeal as affecting his substantial rights. (Pen. Code, § 1259.) "Because [Shannon's] contention is that the instructions caused him to be convicted under an invalid legal theory, this contention need not be preserved by objection in order to be considered on appeal." (*Powell*, *supra*, 63 Cal.App.5th at p. 710; see *People v. Valdez*, *supra*, 55 Cal.4th at p. 151.) In reviewing a claim of instructional error, we review the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. (*People v. Posey*, *supra*, 32 Cal.4th at p. 218.)

As Shannon notes, the trial court instructed the jury that a person may be guilty of a crime in two ways—having directly committed the crime or as having aided and abetted the person who directly committed the crime (CALCRIM No. 400); on the elements of aiding and abetting (CALCRIM No. 401); and on the elements of an uncharged conspiracy (CALCRIM No. 416). CALCRIM No. 416 instructed that "[a] member of a conspiracy is criminally responsible for the acts or statements of any other member of the conspiracy done to help accomplish the goal of the conspiracy." The instruction further explained that the potential conspiracy was to commit murder, that the jury had to agree that the defendant conspired to commit the murder and agree on the degree of the crime.

"Conspiracy principles are often properly utilized in cases wherein the crime of conspiracy is not charged in the indictment or information. In some cases, for example," "the prosecution properly seeks to show through the existence of conspiracy that a defendant who was not the direct perpetrator of the criminal offense charged aided and abetted in its commission." (*People v. Durham* (1969) 70 Cal.2d 171, 180, fn. 7 [concluding that one may aid and abet without joining a conspiracy but all conspirators in a crime qualify as aiders and abettors].) Conspiracy can also be the basis of derivative liability quite apart from aiding and abetting principles. (*People v. Hajek and Vo* (2014)

27

58 Cal.4th 1144, 1200, abrogated on other grounds in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) In short, the California Supreme Court has " 'long and firmly established that an uncharged conspiracy may properly be used to prove criminal liability for acts of a coconspirator' " (*People v. Valdez*, *supra*, 55 Cal.4th at p. 150), and has repeatedly rejected the argument that such use of an uncharged conspiracy reduces the prosecution's burden of proof. (See *ibid*.; *People v. Armstrong* (2019) 6 Cal.5th 735, 794; *Hajek and Vo*, at pp. 1201-1203; see also *People v. Lapierre* (1928) 205 Cal. 470, 471 ["this is not a prosecution for conspiracy, the existence of the conspiracy showing only that appellant aided and abetted the commission of the crime"].)

Shannon urges reexamination of these cases "as they allow guilt based on a theory that impermissibly expands the Penal Code section 31 definition of principal." Shannon contends the conspiracy statute specifies only two types of principals: (1) direct perpetrators and (2) aiders and abettors. Since Penal Code section 31 does not specify that conspirators are principals, Shannon contends conspiracy is not recognized as a theory of criminal liability under the Penal Code and, therefore, the prosecution's reliance on it was unlawful.

Under California law, a party to a crime is either a principal or an accessory. (Pen. Code, § 30.) The Legislature has defined principals as "[a]ll persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present, have advised and encouraged its commission." (Pen. Code, § 31.) The California Supreme Court has explicitly concluded this definition includes conspirators. (*People v. Hajek and Vo*, *supra*, 58 Cal.4th at p. 1201; *In re Hardy* (2007) 41 Cal.4th 977, 1025 ["One who conspires with others to commit a felony is guilty as a principal. ([Pen. Code, ]§ 31)"], superseded by statute on other grounds as stated in *Larsen v. California Victim Comp. Bd.* (2021) 64 Cal.App.5th 112, 132.) As Shannon acknowledges, this conclusion is binding on us. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

28

Through CALCRIM No. 521, the jury was instructed that Shannon had been prosecuted for first degree murder under several possible theories of liability: direct participation, aiding and abetting, and conspiracy. Shannon does not address the possibility the jury convicted him of first degree murder under the separate and still valid theory of an uncharged conspiracy. (See *People v. Armstrong*, *supra*, 6 Cal.5th at p. 794 ["The prosecution may prove an uncharged conspiracy as a means of establishing liability for the underlying substantive crime"].)

Rather, Shannon contends the jury would have necessarily understood the instructions to require it to apply conspiracy principals to the aiding and abetting theory of liability. He notes that the law relating to the mental state for an aider and abettor has changed since *Hajek and Vo* and argues that we should reevaluate the relationship between conspiracy and aiding and abetting. True, the Penal Code now specifically requires that an aider and abettor to a killing harbored the intent to kill. (See *People v. Gentile*, *supra*, 10 Cal.5th at pp. 842-843 [noting amendment to § 188, subd. (a)(3) requires that " 'in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime' "].) And we agree that if the target of the uncharged conspiracy was an offense other than murder such that the theory of liability under the natural and probable consequences was implicated, the changes in the law could require our intervention. (See *People v. Virgen* (2025) 110 Cal.App.5th 440, 443 [instructional error where target crime of the uncharged conspiracy was assault, allowing the possibility that the jury found the defendant guilty of murder based only on participation in the assault and without needing to find that he acted with malice aforethought]; *People v. Rivera* (2015) 234 Cal.App.4th 1350, 1357 [finding instructional error where jury could find the defendant guilty of first degree murder if it found the target crime of the uncharged conspiracy was discharging a firearm at an occupied vehicle and that first degree murder was a natural and probable consequence of that target crime].) But this is not such a case.

Here, unlike in *Virgen* and *Rivera*, the uncharged conspiracy instruction (CALCRIM No. 416) specified *murder* as the target crime. Although there were two passing references to kidnapping early in the instruction, the instruction as a whole made clear that the conspiracy was to commit murder, and required Shannon to have the requisite intent to commit both murders were he to be found guilty of the killings. The jury was told the People must prove that: (1) "The defendant intended to agree and did agree with one or more of the other defendants to commit murder and/or kidnapping"; (2) "At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit murder and/or kidnapping"; (3) "One of the defendants both committed at least one . . overt acts to accomplish the murder of Enrique R[.] and murder and kidnapping of Elijah M[.]"; and (4) "At least one of these overt acts was committed in California." The instruction then continued, clarifying that the jury was required to consider the conspiracy principles with respect to the murder of Enrique and/or the murder *and* kidnapping of Elijah, but that the conspiracy at issue was to commit the target crime of murder. First, the instruction identified the overt act in element No. 3 as the murder of Enrique and murder and kidnapping of Elijah. The instruction also twice specifically clarified that the offense alleged to be the target of the conspiracy was murder: "The People must prove that the members of the alleged conspiracy *had an agreement and an intent to commit murder*" (italics added), and "The People contend that the defendants conspired to commit one of the following crimes: murder." Thus, the jury was instructed that it must find Shannon conspired to kill both Enrique and Elijah in order to find guilt, which reflects the proper intentional mens rea required for aiding and abetting murder under recent California statutory and Supreme Court authority. In arguing that uncharged conspiracy is no longer a viable approach to establishing aiding and abetting liability for murder, Shannon's focus is that the overt act required for a conspiracy may not satisfy the requirement that an aider and abettor actually aid in the murder. To the extent the jury may have considered "an

30

overt act" was something other than the act causing Enrique's or Elijah's death (such as the kidnapping referenced in the uncharged conspiracy instructions), the aiding and abetting instruction in CALCRIM No. 401 forecloses the possibility that the finding of guilt for murder was based on such. The aiding and abetting instruction required: (1) "The perpetrator committed the crime"; (2) "The defendant knew that the perpetrator intended to commit the crime"; (3) "Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime"; and (4) "The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime." (CALCRIM No. 401.) As mentioned above, the uncharged conspiracy instruction identified the target offense as murder. Thus, to the extent the jury relied on the uncharged conspiracy as evidence of aiding and abetting liability, as Shannon posits, "the crime" mentioned in the aiding and abetting instruction could only refer to murder because that was the target of the conspiracy. Accordingly, when read together, the instructions required the jury to find Shannon to have actually aided and abetted the murder in order to find him guilty.

Finally, even if the jury had been instructed on alternate theories of liability, one legally valid and one legally invalid, the error does not require reversal if we determine the error was harmless beyond a reasonable doubt. (*In re Lopez*, *supra*, 14 Cal.5th at p. 580; see *Chapman v. California* (1967) 386 U.S. 18, 24.) Shannon does not address the prejudicial impact of the purported error as applied to the facts here. "It is an appellant's duty to spell out in the briefing exactly how a claimed error caused prejudice; put another way, we do not presume prejudice. Accordingly, the failure to explain with particularity how a claimed error caused prejudice forfeits the claim." (*People v. Reardon* (2018) 26 Cal.App.5th 727, 740.) Nevertheless, under the facts of this case, there was no way to find Shannon guilty of both first degree murders under an aiding and abetting theory without implicitly finding he assisted in the act that caused the deaths of Enrique and Elijah. (Cf. *In re Lopez*, *supra*, 14 Cal.5th at p. 580 [when a jury is

31

instructed on both a valid and invalid theory of liability, a reviewing court may assess prejudice by " 'examin[ing] what the jury necessarily did find and ask[ing] whether it would be impossible, on the evidence, for the jury to find that without also finding the missing fact as well' " (italics omitted)].)  With respect to Enrique, Shannon was present when David told Jonathan that he wanted blood from Elijah and that he had to retrieve his gun.  It was Shannon's idea to get to Elijah through Enrique and Shannon messaged Enrique and picked him up.  At David's direction, Shannon drove to the remote area, pulled over, and joined David as he retrieved his gun and ordered Enrique out of the car.  Shannon used his friendship to lure Enrique out, used his car to transport the group, and used his physical presence outside the car to help ensure Enrique's compliance in getting out and stripping down before Enrique ran into the river as he was shot by David.

Elijah's murder happened after Enrique was killed.  At the remote location, Shannon held Elijah at gunpoint ensuring David could kill Elijah.  Everyone (including Shannon) took turns hitting Elijah in the head with a heavy branch before David shot him in the head.  Under the circumstances here, we are convinced any purported instructional error in the mental state requirements for aiding and abetting murder was harmless beyond a reasonable doubt.

V

*Parole Revocation Fines must be Stricken and the Abstract of Judgment Corrected*

At sentencing, the trial court imposed a $300 parole revocation fine pursuant to Penal Code section 1202.45 stating that such a fine only applies if Shannon or Campos is ever placed on parole, which the court found unlikely.  Both Shannon and Campos contend, and the People agree, we must strike this fine because they were each sentenced to a term of life without possibility of parole.  We agree with the parties.  Although Campos seeks to join this argument for the first time in his reply brief, he is entitled to the requested relief.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 186-187 [a court

32

"that properly assumes or retains jurisdiction of a case 'may correct such errors on its own motion or upon the application of the parties' "].)

A parole revocation fine under Penal Code section 1202.45 is unauthorized in cases where the defendant is sentenced to LWOP and there are no determinate terms. (*People v. Montes* (2021) 70 Cal.App.5th 35, 48-49; *People v. McInnis* (2021) 63 Cal.App.5th 853, 866-867; see *People v. Baker* (2021) 10 Cal.5th 1044, 1108 [parole revocation fine held applicable despite death sentence "because defendant was also sentenced to a determinate term"].) We recognize that the court not only imposed life sentences, but also sentenced Shannon and Campos each to a determinate term of eight years for the kidnapping conviction, but we note that term was stayed under Penal Code section 654. In that situation the parole revocation fine is not applicable because Penal Code "section 654 prohibits the use of a conviction for any punitive purpose if the sentence on that conviction is stayed" (*People v. Pearson* (1986) 42 Cal.3d 351, 361, overruled on other grounds in *People v. Vidana* (2016) 1 Cal.5th 632, 651), and the Penal Code section 1202.45 fine is considered punitive for ex post facto purposes (*People v. Cruz* (2012) 207 Cal.App.4th 664, 672-673, fn. 8).

Because Shannon's and Campos's respective determinate sentences are suspended, their current sentence does not presently allow for parole. When "[a]t present, defendant's 'sentence' does not allow for parole," a parole revocation fine is unauthorized. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1185.) We will strike the parole revocation fine for both Shannon and Campos.

Shannon and Campos also both contend, and the People agree, that two corrections must be made to the abstract of judgment. We agree. "[A] court has the inherent power to correct clerical errors in its records so as to make these records reflect the true facts." (*In re Candelario* (1970) 3 Cal.3d 702, 705.)

Specifically, the enhancements under Penal Code section 12022, subdivision (a)(1), which were attached to counts 1 and 2, should be on the indeterminate abstract of judgment, not as at present, on the determinate sentencing form.

Second, both of Campos's abstracts of judgment and Shannon's abstract of judgment for the determinate sentence for kidnapping erroneously state the year the crimes were committed was 2018. The crimes were committed in 2016.

Finally, with respect to Campos and for the sake of clarity, we order box No. 5 on the indeterminate abstract of judgment to be unchecked. As he notes, his indeterminate sentences for counts 1 and 2 are adequately described in box Nos. 6 and 4, respectively.

## DISPOSITION

As to both Campos and Shannon, the judgment is modified to strike the $300 parole revocation fine and the clerk of the court is directed to issue amended and corrected abstracts of judgment reflecting removal of the fine, that the crimes were committed in 2016, and that the enhancements under Penal Code section 12022, subdivision (a)(1) are attached to the indeterminate terms. As to Campos, box No. 5 shall be unchecked. The clerk shall forward certified copies of the abstracts of judgment to the Department of Corrections and Rehabilitation.

As to Shannon, the judgment is otherwise affirmed.

As to Campos, the judgment is thereafter conditionally affirmed, subject only to a new transfer hearing pursuant to section 707. The matter is remanded to the superior court with directions to refer the case, no later than 30 days from the filing of the remittitur to the juvenile court for a transfer/fitness hearing, to determine if it would have transferred the case to adult criminal court had it originally been filed in the juvenile court in accordance with current law.

If the juvenile court determines it would not have transferred Campos to criminal court under current law, it shall treat Campos's convictions as juvenile adjudications as of

34

the date Campos was convicted and impose an appropriate disposition within its usual timeframe.

If the juvenile court determines it would have transferred Campos to adult criminal court, it shall transfer the case to criminal court, which shall then reinstate Campos's sentence with the above ordered modification and corrections to the abstract of judgment.


_____/s/_____<br>
EARL, P. J.

We concur:


_____/s/_____<br>
ROBIE, J.


_____/s/_____<br>
DUARTE, J.